UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

TIMOTHY SCHOLTES,                              Civil No. 07-2604 (DWF/FLN)

        Plaintiff,

v.

MICHAEL J. ASTRUE,                            **REPORT AND RECOMMENDATION**
Commissioner of Social Security,

        Defendant.

---

Randall J. Fuller, Esq., for Plaintiff
Lonnie F. Bryan, Assistant U.S. Attorney, for the Government.

---

Plaintiff Timothy Scholtes seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied his application for supplemental security income ("SSI"). See 42 U.S.C. § 1382 (c).  The matter has been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636 and Local Rule 72.1(c).  This Court has jurisdiction over the claim pursuant to 42 U.S.C. § 405(g) and 1383 (c)(3).  The parties have submitted cross-motions for summary judgment.  For the reasons set below, it is this Court's recommendation that the Commissioner's decision be **affirmed.**

## I.  INTRODUCTION

Mr. Scholtes applied for SSI on June 28, 2004 alleging an onset date of disability of January 4, 2004 (a date approximately coincident with the beginning of his sobriety from alcohol and multiple drug usage). (Tr. 362, 199). His alleged impairments were heart problems, chronic

obstructive pulmonary disease ("COPD"), kidney infection, and mental health problems (Tr. 81). He also reported an inability to work after an untreated episode of sun stroke (Tr. 95, 132), pain in his feet (Tr. 123), and a worsening of his mental status (Tr. 140). The Social Security Administration denied the application initially on July 20, 2004, and again denied the application upon reconsideration on November 15, 2004. (Tr. 15). On December 7, 2004, Mr. Scholtes filed a timely request of a hearing. (Tr. 15). Also on December 7, 2004, Midwest Disability P.A. prepared a Disability Report-Appeal (form SSA-3441-BK) for Mr. Scholtes. (Tr. 105-111). The hearing was set to be held before Administrative Law Judge ("ALJ") David K. Gatto on September 21, 2006. (Tr. 15). On September 19, 2006 Randall J. Fuller, Esq. of Midwest Disability P.A. wrote a letter restating Mr. Scholtes' alleged disabilities as biopolar disorder, diabetes, neuropathy, low back pain, COPD, and difficulty with concentration. (Tr. 149-150). At the hearing Mr. Scholtes was represented by attorney Fuller. (Tr. 111, 336). The ALJ carefully considered the entire record and determined that Mr. Scholtes has not been under a "disability," as defined in the Social Security Act, since June 28, 2004. (Tr. 25). The ALJ rendered a decision dated October 20, 2006, denying Plaintiff's claim for benefits. (Tr. 12). Mr. Scholtes appealed that unfavorable decision to the Appeals Council, which denied review on April 11, 2007, making the decision of the ALJ the final decision of the Commissioner. (Tr. 6-8)

Mr. Scholtes initiated this action on June 6, 2007. (See Dkt. No. 1.) Both parties have submitted cross-motions for Summary Judgment. (See Dkt. Nos. 5 and 10.) Mr. Scholtes raises the following issues in his motion: (1) whether the ALJ erred in rejecting the testimony of the medical expert, Dr Felling, when finding that the plaintiff met listing for 12.04(C) or equaled listing 12.04(B) from July 2004 to the present; (2) whether the ALJ erred in rejecting the

opinions of the treating physicians, Drs. Ebrahimi and Scott, by incorrectly applying Social

Security Ruling 96-5p; and (3) whether the ALJ erred in finding that the plaintiff could perform

sedentary work on a full-time basis.

## II. STATEMENT OF FACTS

### A.  Background

Mr. Scholtes was born on June 19, 1963. (Tr. 62).  He was 40 years old at the onset of the

alleged disability, and 43 years old at the time of the ALJ decision.  Mr. Scholtes has a history of

difficulty with reading and writing. (Tr.344). In school he participated in special education

classes, and he completed high school in 1983. (Tr. 135).  Mr. Scholtes went on to obtain a

certificate in welding from a vocational school although he has never worked as a welder. (Tr.

362-363).

Mr. Scholtes has worked in construction and as a laborer (Tr. 72-80), including work as a

laborer from April, 2001 to August, 2001 for two different companies. (Tr. 67, 88, 138, 148). He

has also performed odd jobs for friends and family. (Tr.88). Mr. Scholtes had no earnings

reported  from 1998-2000. (Tr. 68).  He has not worked at all since January 4, 2004. (Tr.340).

Mr. Scholtes has reported that drugs and alcohol have played a very important role in his

inability to maintain employment. (Tr. 199).

Mr. Scholtes claims to live alone.  (Tr. 343).  He pays rent for a room of a house to a

woman described alternatively in the record as a friend, girlfriend, common-law wife, or wife.

(Tr. 63,140, 199, 294).  She is the mother of his two adult children. (Tr. 199).  He has a driver's

license and owns and operates a vehicle.  (Tr. 63).  Mr. Scholtes does his own grocery shopping,

attends Alcoholics Anonymous meetings once a week, and spends his time sleeping or watching television. (Tr. 100,101).

B. **Medical Evidence - Physical Impairments**

Mr. Scholtes has a long and complicated relationship with Minnesota's medical community.  Since 2004 he has seen not less than a dozen doctors for a variety of medical and mental hardships.

On April 21, 2004, Mr. Scholtes was seen by Dr. Haycroft at the Bloomington Lake Clinic for a physical examination. (Tr. 158).  Mr. Scholtes described sharp pains in both heals, increasing dyspnea, left shoulder pain, a rash on his chest, and wheezing with exertion. (Tr. 158). Mr. Scholtes described an incident of electrocution eight years previous to the examination. (Tr. 159). Dr. Haycroft's physical examination noted a 6 foot 3¼ inch 299 pound male with a blood pressure of 136/104, clear lungs, a rash on the chest wall, some bilateral varicosities, regular heart sounds, hypesthesia of the bottom of the feet, tenderness of the bottom of the feet, a small hernia, and a small hemorrhoid. (Tr. 158-159).   Dr. Haycroft noted in his assessment hypertension, plantar fasciitis, a seborrheal chest wall, obesity, a personal history of heat stroke, a history of drug and alcohol abuse, and dyspnea with exertion. (Tr. 158).   Dr. Haycroft recommended that Mr. Scholtes be seen for a follow up for dyspnea with exertion, and that he see Dr. Schall for a ganglion cyst removal. (Tr. 158).  Dr. Haycroft further recommended that Mr. Scholtes quit smoking. (Tr. 160).  Dr. Haycroft prescribed Advair, Cozaar, and 2.5% hydrocortisone cream. (Tr. 158).

On April 28, 2004, Dr. Schall saw Mr. Scholtes for a ganglion cyst which was successfully removed by Dr. Schaal the following month. (Tr. 157, 152).

4

Mr. Scholtes returned to the Bloomington Lake Clinic on April 29, 2003, for a follow up for dyspnea with exertion. (Tr. 156).  He was found to have early signs of COPD, found to engage in excessive smoking, and found to be significantly overweight. (Tr. 156).  Dr. Haycroft referred Mr. Scholtes to a pulmonary specialist to determine the extent of his lung disease. (Tr. 156).

Mr. Scholtes went to the Minnesota Lung Clinic on May 19, 2004, for spirometry. (Tr.168). The test results were returned to  Dr. Haycroft at the Bloomington Lake Clinic who provided a diagnosis of COPD/emphysema on May 25, 2004, at Mr. Scholtes' follow up appointment.  Tr. (Tr. 155).  At this point there was no report in the record from the pulmonary specialist.  Dr. Haycroft noted improvements in Mr. Scholtes' hypertension, improved appearance of the chest wall rash, and a "spectacular" peak flow rate of 520. (Tr. 155).  Dr. Haycroft recommended that Mr. Scholtes continue his blood pressure and obstructive lung medications. (Tr. 155).

Mr. Scholtes returned to the Minnesota Lung Clinic June 1, 2004, and June 28, 2004, for additional spirometry. (Tr. 168-170). On June 4, 2004, Dr. Steele diagnosed emphysema, with an otherwise normal CT scan of the chest (based on tests interpreted by Dr. Bressler). (Tr. 171).  On June 28, 2004, the physical exam notes from the Minnesota Lung Clinic indicate that the dyspnea reported by Mr. Scholtes was "out of proportion to findings."  (Tr. 165).   Dr. Steele referred Mr. Scholtes for a cardiology evaluation. (Tr. 178).

On July 1, 2004, Mr. Scholtes went to the Minnesota Heart Clinic for an echocardiogram. (Tr. 178).  Dr. Ip reported that this echocardiogram was difficult to perform because of excessive weight.  Tr. (Tr. 175).  Mr. Scholtes had normal biventricular function and the Doppler study did

not suggest any severe valvular dysfunction. (Tr. 175).   A physical examination yielded no signs of congestive heart failure. (Tr. 175).   During this examination Mr. Scholtes reported abstaining from drug usage for seven years although his statement is inconsistent with other reports in the record which note his ongoing drug use. (Tr. 174). Dr. Ip opined that the patient's symptoms were more compatible with COPD than cardiac problems. (Tr. 177).   Dr. Ip recommended a stress test to further investigate the possibility of coronary artery disease. (Tr. 177).

On July 13 and 14, 2004, Mr. Scholtes had two tests performed with Dr. Chapel: an exercise test, and myocardial perfusion scintigraphy. (Tr. 173).   During the exercise test Mr. Scholtes demonstrated an adequate cardiac workload and an adequate functional aerobic capacity. (Tr. 173).   The exercise test was characterized as a "negative ECG stress with ventricular ectopy noted." (Tr. 173).   The myocardial perfusion scintigraphy was consistent with mild ischemia with diaphragm attenuation.  (Tr. 173).  Gating demonstrated a mildly dilated left ventricle with good contractility and no significant regional wall motion abnormality. (Tr. 173).

On August 16, 2004, Mr. Scholtes went to Smiley's Clinic where he was seen by Dr. Scott for blood in his urine. (Tr. 250).  At this examination Mr. Scholtes reported joint pain, trouble breathing, and requested a sleep apnea test. (Tr. 249).   Dr. Scott's examination demonstrated a blood pressure of 125/70, a weight of 332 pounds, no heart murmurs, and clear lungs. (Tr. 250).  Dr. Scott recommended that Mr. Scholtes continue his medications and return to the clinic for a follow up. (Tr. 250).

On August 23, 2004, Mr. Scholtes returned to see Dr. Scott.  Tr. (Tr. 247).  Dr. Scott's examination identified bilateral expiratory wheezing, no apparent paraspinal tenderness or lumbar spine tenderness, and bilateral tenderness of the metatarsals. (Tr. 247).  Dr. Scott gave

Mr. Scholtes two referrals, one for physical therapy, and one to visit a podiatrist, Dr. Langer. (Tr. 247).   Jill Robinson M.D. also signed Dr. Scott's charts in 2004. (Tr. 247).

On December 27, 2004, Dr. Scott completed the Social Security Physical RFC Questionnaire.  (Tr. 231).  In this questionnaire Dr. Scott reports a diagnosis of emphysema and obesity. (Tr. 230).   He reports that Mr. Scholtes' symptoms would seldom interfere with his concentration and attention.  (Tr. 231).  He reports that Mr. Scholtes can tolerate a low stress job. (Tr. 231).  Dr. Scott reports that in an eight hour day, five-day per week basis,  Mr. Scholtes is capable of sedentary work, lifting up to 10 lbs, occasionally lifting and carrying small items, standing/walking no more than two hours in eight-hour day. (Tr.231-232).  Dr. Scott also reports that in an eight-hour day the patient can sit for about 6 hours and stand/walk for about 4 hours. (Tr. 235).  In this report Dr. Scott indicated that Mr. Scholtes was capable of part time work in a competitive setting 4 hours a day five days a week. (Tr. 232). At this time Dr. Scott was not board certified. (Tr. 235).

In 2005 there is no record of Mr. Scholtes seeking medical attention for physical aliments.

On February 2, 2006, Mr. Scholtes saw Dr. Parry at the University of Minnesota Medical Center EMG lab.  (Tr. 253). Mr. Scholtes was seen for dysethesias in his feet, back pain, and right calf pain. (Tr. 253).  Upon testing Dr. Perry identified 1) mild axonal neuropathy, and 2) no definite evidence of lumbosacral radiculopathy, but a possibility of spinal stenosis.  (Tr. 253).

On February 16, 2006, an MRI of the spine was performed to evaluate for stenosis. (Tr. 251).  Dr. Lowes, the principal results interpreter, found "mild multilevel degenerative disc and facet disease superimposed upon some mild congenital bony canal stenosis resulting in mild to

moderate central canal and bilateral neural formaminal stenosis at L4-5 and L5-S1." (Tr. 252). The ordering provider of these tests was Dr. Scott. (Tr. 251).  There is no record to indicate whether Dr. Scott saw Mr. Scholtes in early 2006 prior to or after this testing.  Dr. Scott's previous documented contact with Mr. Scholtes was on August 23, 2004. (Tr. 247).

On March 8, 2006, Dr. Scott completed a "Request of Medical Opinion" form on which he indicated that Mr. Scholtes had a diagnosis of  lateral femoral cutaneous nerve syndrome. (Tr. 245).  Dr. Scott indicated that after June 8, 2006, Mr. Scholtes could work 2 hours per day, no lifting greater than 5 lbs. (Tr. 245).

On April 14, 2006, Dr. Wei of Therapy Partners wrote to Dr. Mullan of Neurosurgical Associates a letter stating that his impressions of Mr. Scholtes include chronic back pain, possible L4 radiculopathy, mild to moderate central canal stenosis at L4-5 with degenerative disk disease, most sever at L5-S1, obesity, depression, neuropathy, and that rehab is recommended (Tr. 257.)  In his notes Dr. Wei indicates that the patient reported mowing his lawn, and that he is active a few hours a day (Tr. 263).

Mr. Scholtes attended physical therapy at Therapy Partners until June 7, 2006, after which time he canceled his appointment, did not return for follow ups, and did not respond to messages at his home (Tr. 284).    While he was in physical therapy he was making progress and his sitting tolerance was improving. (Tr. 283).

On July 26, 2006, Mr. Scholtes returned to Smileys Clinic for a follow up to a complaint about pain and numbness in his feet. (Tr. 294).  At this visit he was cared for by Dr. Warford who noted that Mr. Scholtes was mendacious during his examination: "occasionally he would say no when I touched him with the monofilament, thus indicating to me he could feel it." (Tr.

8

294).   The examination also noted clear lungs, good muscle strength and reflexes, well perfused

extremities, and some decrease in leg hair progressing distally from the tibia. (Tr. 294). Dr.

Warford noted an elevated A1C in the chart, and determined that Mr. Scholtes had not had his

blood sugars checked as previously instructed. (Tr. 294). Dr. Warford recommended that Mr.

Scholtes be tested for diabetes, recommended that the patient wear shoes at all times,

recommended weight loss, and discussed discontinuation of tobacco use. (Tr.294).

On August 9, 2006, Mr. Scholtes again saw Dr. Warford. (Tr. 292).  This visit was for

follow up to a diabetes diagnosis. (Tr. 292) Dr. Warford's notes indicate that Mr. Scholtes was

seeking narcotics, and that she was again unable to demonstrate his neuropathy using the

monofilaments (Tr. 293).   Dr. Warford discontinued gabapentin and prescribed Lyrica for the

neuropathy. (Tr.293).

Mr. Scholtes returned to Smileys Clinic on August 17, 2006, for a follow up for foot

pain. (Tr. 290).  Dr. Patterson opined that she "suspect[ed] that this [foot pain] might be more

related to small vessel peripheral artery disease, rather than neuropathy." (Tr. 291).  Dr.

Patterson acquiesced to the patient's request for a referral to a pain clinic, and noted that he was

not seeking narcotics at this visit.  Tr. (Tr. 291).

Mr. Scholtes began attending therapeutic pool sessions with the Fairview Pain

Management Center Reconditioning Services in November of 2006.  (Tr. 317).   Mr. Scholtes

was reported to be working hard during these sessions and making improvements with his

stability in the water. (Tr. 317).   There is no record that these sessions have been discontinued.

### C.  Medical Evidence – Mental Impairments

In July of 2004 Mr. Scholtes became affiliated with the Associated Clinic of Psychology for treatment.  Tr. (Tr. 195).  Mr. Scholtes presented himself as a depressive recovering addict with problems staying focused, difficulty sleeping, and a long history of hyperactivity. (Tr. 195). Mr. Scholtes started seeing Mr. Driscoll bimonthly for therapy sessions. (Tr. 192).

On August 9, 2004, Mr. Scholtes had a psychiatric evaluation by Dr. Ebrahimi. Mr. Scholtes reported that he had been sober for 7 months, and that he had gained 70 pounds since quitting methamphetamine. (Tr. 199-200).  Mr. Scholtes reported extensive encounters with law enforcement, including 300 arrests and six DWIs. (Tr. 196, 200).   Mr. Scholtes also reported that an important factor in his long history of difficulty maintaining employment was his drug and alcohol use. (Tr. 199).  He has not been hospitalized, and has no history of self-injurious behavior  or suicide attempts. (Tr. 200).  During the evaluation Mr. Scholtes "sat comfortably without fidgeting, and [his] speech was nonstop and at times irrelevant." (Tr. 200).  No movement disorders were noted. (Tr. 200). Although he was anxious his affect was neutral and well modulated. (Tr. 200).  Dr. Ebrahimi's diagnostic assessment included polysubstance dependence, bipolar disorder NOS, rule out attention deficit disorder (ADD), a history of antisocial behavior more consistent with his drug use, and a Global Assessment of Functioning ("GAF") score of 55. (Tr. 201).   Dr. Ebrahimi asked Mr. Scholtes to see a sleep specialist, prescribed trazodone and Lamictal, and suggested a follow up evaluation for ADD.

Upon the advice of his psychiatrist Mr. Scholtes had a psychological evaluation with Dustin Warner Psy.D. at the Associated Clinic of Psychology on August 27, 2004, to determine the presence of Attention Deficit Hyperactivity Disorder (ADHD). (Tr. 185).  At this appointment Mr. Scholtes reported that his last date of drug use was January 18, 2004. (Tr. 185).

10

On a variety of psychological tests Mr. Scholtes scored in borderline, low average, and mild to moderate impairment ranges. (Tr. 186). There was a severe impairment on a color naming test. (Tr. 187). Mr. Scholtes was diagnosed with depressive disorder NOS, Attention Deficit Disorder, polysubstance dependence, borderline intellectual functioning, and dependant personality features (Tr.188). Dr. Warner diagnosed Mr. Scholtes with a GAF of 45. (Tr. 188).

From September 7, 2004, Mr. Scholtes had return visits to Dr. Ebrahimi every other month for medication checks. (Tr. 275-282, 307-310).

On October 22, 2004, James Alsdurf Ph.D. provided an independent psychological consultation based on Mr. Scholtes' medical record. Dr. Alsdurf notes that Mr. Scholtes "did not allege mental problems on his initial claim." (Tr. 229). On November 10, 2004, Dr. Alsdurf submitted a report on Mr. Scholtes' mental residual functional capacity. (Tr. 228). Dr. Alsdurf noted the previous GAF score of 45 in the medical record. (Tr. 228). He determined that:

> The claimant retains the capacity to concentrate on, understand, and remember routine, repetitive tasks, and three and four step, uncomplicated instructions, but would have moderate problems with detailed, and marked problems with complex instructions.
> The claimant's ability to carry out tasks with adequate persistence and pace would be intact for routine, repetitive, or three and four step tasks, but moderately impaired for detailed and markedly impaired for complex tasks.
> The claimant's ability to interact and get along with co-workers would be moderately impaired, but adequate for brief superficial contact [sic]
> The claimant's ability to interact with the public would be moderately impaired, but adequate for brief and superficial contact.
> The claimant's ability to follow ordinary routine would be moderately impaired, but adequate to function with the ordinary level of supervision found in most customary work settings.
> The claimant's ability to handle stress would be moderately impaired, but adequate to tolerate the routine stressors of a routine, repetitive and three and four step work setting. (Tr. 228, 222).

On January 3, 2005, Dr. Ebrahimi completed a Social Security Mental RFC Questionnaire (Tr. 236).  On this form there are multiple GAF scores reported as 55 and 60-65. (Tr. 236).  Inconsistent with these GAF scores, Dr. Ebrahimi opined that Mr. Scholtes had a complete inability to function independently outside the house, and an inability to maintain persistence and pace to engage in competitive employment.  (Tr. 238-239).

On April 2, 2006 Dr. Ebrahimi faxed a portion of a form to Midwest Disability stating that Mr. Scholtes can not work in the foreseeable future. (Tr.255).

**D.  Plaintiff's Testimony**

At the administrative hearing on September 21, 2006, Mr. Scholtes was accompanied by his attorney Mr. Fuller when he testified to his impairments and conditions. (Tr. 338).  Mr. Scholtes testified that he has not worked since January 4, 2004. (Tr. 340).   His last employment was as a laborer in 2001. (Tr. 340).  He stated that he suffered from heat stroke in 2001 and has had breathing problems, including COPD, which prevent him from working. (Tr. 340).  He claimed that his breathing problems could be triggered by a flight of stairs or walking half a block, and that he has asthma attacks triggered by excessive lifting, carrying, or by damp weather. (Tr. 345).  He stated that he has coughing attacks three to four times a week that last five to ten minutes. (Tr. 346).

Mr. Scholtes also stated that he has neuropathy in his feet that prevents him from working, as well as back pain and numbness in his legs. (Tr. 340, 342).   He reported that his back pain was present every day that could be made worse by lifting, laying around, or walking. (Tr. 346).   Mr. Scholtes testified that his foot pain would get worse upon sitting after walking or

12

standing. (Tr. 347).  Mr. Scholtes testified that he receives some relief from his medications and treatments. (Tr. 341).

Mr. Scholtes testified that he is diabetic and that he has attended diabetic education. (Tr. 347-348).

Mr. Scholtes testified that his medication did help with his anxiety, but that he still suffered from anxiety and depression daily. (Tr. 342, 348).   He stated that he was taking Ambien to help with sleeping, and that his sleeping was "okay" with the Ambien. (Tr. 342, 351). He stated that his depression makes motivation difficult for him, and that he stays in bed until the afternoon almost daily. (Tr. 348-349). He testified that his depression can make him feel like he is going to break down and cry two or three times a week. (Tr. 349-350).  He stated that he has issues with self confidence and self-esteem and that he spends a lot of time worried about the future. (Tr. 350).  Mr. Scholtes testified that he has difficulty leaving his room.  (Tr. 350). Mr. Scholtes also stated that he has difficulty with irritability and anger. (Tr. 349).

Mr. Scholtes stated that he is renting a room in a house with three people, where he lives in a room in the basement. (Tr. 343)  He has a drivers license and drives his own car to AA meetings and to the store. (Tr. 343).

Mr. Scholtes testified that he has gained 20 pounds in the last year or two because of his disabilities. (Tr. 344).  He also testified that he has been sober for two years and nine months. (Tr. 343).

### E.  Medical Expert's Testimony

At the administrative hearing, Dr. Felling testified as a neutral medical expert. (Tr. 356). Dr. Felling stated that Mr. Scholtes carried a number of different diagnoses. (Tr. 356). Dr.

13

Felling described testing which was suggestive of borderline functioning and a history of depression (Tr. 356).

Dr. Felling testified to several inconsistencies and omissions in the medical record as developed by Dr. Ebrahimi. Dr. Felling stated that Dr. Ebrahimi had made a diagnosis of bipolar condition. (Tr. 356).   Dr. Felling states that based on the record he was given "technically… [Mr. Scholtes] wouldn't meet the criteria for bipolar, except what they might call a bipolar NOS condition, but that's the diagnosis he's been given." (Tr. 357)   Dr. Felling also felt that the symptoms of attention deficit disorder were not clear despite the diagnosis. (Tr. 357).  He noted that Dr. Ebrahimi tends to keep his notes in handwritten form and that they were "totally unrecognizable." (Tr. 357).  Dr. Felling questioned the basis for the diagnosis of a personality disorder, stating that it appeared to be based on Mr. Scholtes' time as an addict and his numerous legal difficulties. (Tr. 357).   Dr. Felling also identified inconsistencies in Exhibit 9F. (Tr. 358). Dr. Felling testified that in Exhibit 9F Dr. Ebrahimi "has a GAF score of 60 to 65, which certainly in inconsistent with his ratings.  But then below that is a 55 and I don't know where that came from…   And then he has one rating he has a complete inability to function independently outside his home.  He says yes… that doesn't fit with other things." (Tr. 358).  Dr. Felling goes on to point out that under the B criteria Dr. Ebrahimi rated Mr. Scholtes ability to maintain concentration, persistence, and pace as moderate.  (Tr. 358) Dr. Felling indicated that this was inconsistent with next page of Exhibit 9F with respect to the severity level of the impairment (Tr. 359).  Dr. Felling further testified that Mr. Scholtes had GAF scores as low as 45, but that 50 to 55 was generally the rating that he received. (Tr. 359).

Dr. Felling testified that in his opinion the combination of impairments meet or was equal to a listed impairment (ability to maintain concentration, persistence, and pace).  (Tr. 357).  Dr. Felling stated that this opinion was based primarily on Dr. Ebrahimi's ratings in Exhibit 9F.  (Tr. 357).  Dr. Felling stated that he was taking Dr. Ebrahimi "at his ratings" in 9F. (Tr. 358).

When questioned by the ALJ Dr. Felling stated that a GAF score of 60 to 65 would not be consistent with a marked impairment in concentration, persistence, and pace.  (Tr. 359).  He further stated that a marked impairment would occur "somewhere in that 50 range or below." (Tr. 359).

### F.  Vocational Expert's Testimony

At the administrative hearing Ms. Barbara Wilson Jones testified as a neutral Vocational Expert ("VE"). (Tr. 361).  Ms. Jones determined that Mr. Scholtes had previously been employed as a construction worker and as a sewage worker. (Tr. 362).  The ALJ asked her to consider a hypothetical man who was a younger individual as defined by the Social Security regulations, who had the same educational background as Mr. Scholtes, with severe impairments of chronic, obstructive pulmonary disease and asthma, degenerative disk disease of the lumbar spine with lower back pain, diabetes mellitus Type II, neuropathy of the feet due to a history of electrocution, obesity, borderline intellectual functioning, and effective disorder which has been characterized as both depressive disorder not otherwise specified and biopolar disorder, an attention deficit disorder, personality disorder, and a history of poly-substance abuse.  The ALJ instructed that this person was limited to light exceptional work as defined by the Dictionary of

15

Occupational Titles with only occasional climbing of stairs or ramps, no climbing of ladders, ropes, or scaffolds.  Balancing, stooping, and kneeling would be limited to occasional.  There would be no crouching or crawling, no exposure to concentrated chemicals, dust, or fumes in the workplace or to humidity or temperature extremes and no exposure to unprotected heights. There would be no use of foot controls with either foot. Due to the psychological impairments, the work would be unskilled, and entail only brief and superficial contact with the public, coworkers, or supervisors.  The stress level would be commensurate with entry level work.  (Tr. 363-364).

The VE testified that a person with such hypothetical characteristics could not perform the work of a sewer worker or a construction worker.   (Tr. 364).  The VE testified that such a person could perform a number of jobs in the State of Minnesota such as a poly-pack sealer (2000 available jobs), an electrode cleaner (2500 jobs available), and a spark tester (2000 jobs available).  (Tr. 365-366).

The ALJ reduced the residual functional capacity to the sedentary level with everything else remaining the same in his hypothetical.  The VE then testified that such a person could perform a number of jobs in the State of Minnesota such as a spotter or table monitor (3000 jobs available), a bonder of semiconductors (2500 jobs available), or a lens inserter (1800 jobs available).  (Tr. 367).

The ALJ then added the restriction that the hypothetical person would need an hourly sit/stand option for a brief one or two minutes to stretch with everything else remaining the same in his second hypothetical.  The VE then testified that such a restriction would not alter the available jobs.  (Tr. 368).

16

The VE testified based on further ALJ questioning that if a person were to miss three to four days out of a month, required unscheduled breaks of unspecified durations such that they might not complete a full day of work, and/or leave the workplace and not return for the rest of the day, he would not be employable for the unskilled light or sedentary jobs identified. (Tr. 368).

**G.   The ALJ's Decision**

In determining whether Mr. Scholtes was disabled, the ALJ followed the five-step sequential process established by the Social Security Administration (20 C.F.R. §416.920(a)). In the first step the ALJ determined that Mr. Scholtes had not engaged in substantial gainful activity (20 C.F.R.  416.920(b)) since January 4, 2004, the date of his application for SSI benefits.  (Tr. 17).

In the second step of the evaluation process, the ALJ determined that Mr. Scholtes  had the following severe impairments: chronic obstructive pulmonary disease/asthma; polysubstance dependency, in remission; obesity; bipolar disorder NOS with depression; borderline intellectual functioning; attention deficit disorder, inattentive type; dependent personality disorder; degenerative disc disease of the lumbar spine; type II diabetes mellitus; and peripheral neuropathy affecting the feet (20 C.F.R. §414.920(c)).  (Tr. 17). The ALJ determined that these impairments resulted in more than minimal limitations on the performance of basic work activities. (Tr. 17).

In the third step of the analysis, the ALJ determined that Mr. Scholtes does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments  in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §416.920(d), §416.925,

17

and §416.926).   (Tr. 17). In making this determination the ALJ reviewed the entire record and found insufficient evidence to support the severity of a listed physical impairment. (Tr. 17). The ALJ determined that Mr. Scholtes' diabetes was recently diagnosed and does not require medical management other than diet and exercise. (Tr. 17) His pulmonary disease was determined to be under control of medication and without medical intervention since 2004 despite Mr. Scholtes' continuing smoking habit.  Tr.  (Tr. 17).  The neuropathy was determined to not significantly impair Mr. Scholtes' ability to bear weight and ambulate. (Tr. 17).

The ALJ then considered Mr. Scholtes' mental impairments utilizing the analysis set forth in 20 C.F.R. 416.920a.  (Tr. 18).   After considering the entire record, the ALJ determined that the mental impairments established in the record alone or in combination result in moderate limitations in activities of daily living and social functioning, and moderate limitations in concentration, persistence, or pace, and no episodes of decomposition.   (Tr. 18).

The ALJ next assessed Mr. Scholtes' residual functional capacity (RFC). The ALJ determined that Mr. Scholtes has the RFC

> to lift and carry 10 pounds occasionally, stand and/or walk 2 hours of an 8-hour day, sit 6 hours of an 8-hour day, allowing for an hourly sit or stand option for 2 to 3 minutes in duration, avoiding all crouching and crawling, limited to occasional stooping and kneeling, avoiding concentrated exposure to chemicals, dust, fumes, and extremes in humidity and temperature, as well as work at unprotected heights, avoiding the use of foot controls, and further limited to unskilled work with brief and superficial contacts and stress levels commensurate to that of entry-level work.

(Tr. 18). The ALJ found that Mr. Scholtes' medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that Mr. Scholtes' statements concerning the intensity, persistence and limiting effects of these symptoms was not entirely credible.  (Tr. 19).

The ALJ considered all medical opinions in the record. (Tr. 22).  Some weight was given to the testimony of Dr. Felling, the medical expert, but because of inconsistencies in his testimony, the ALJ placed no weight on Dr. Felling's opinion regarding Mr. Scholtes having marked limitations. (Tr. 22).  Specifically, the ALJ observed that Dr. Felling agreed with Dr. Ebrahimi's opinion that there were marked limitations, but Dr. Felling also testified that the treating source GAF assessments of 55 to 60 were not consistent with limitations. (Tr. 22). The ALJ found that Mr. Scholtes' dyspnea and pulmonary disease were stable and required no ongoing specialized care since 2004. (Tr. 22-23).  The ALJ further found that Mr. Scholtes' ongoing use of cigarettes was directly opposed to his treatment and inconsistent with a finding of disability. (Tr. 23).

With regard to Mr. Scholtes' low back pain and peripheral neuropathy, the ALJ found that these were managed conservatively despite Mr. Scholtes' insistence that he required narcotic pain medications. (Tr. 23).  The ALJ also observed that Mr. Scholtes had made progress in physical therapy, but he had failed to continue this treatment.  Tr. (Tr. 23).

The ALJ determined that Dr. Scott's opinion in Exhibit 8F was inherently inconsistent because Dr. Scott found that Mr. Scholtes was both incapable of competitive work and capable of sedentary work.   The ALJ also determined that Dr. Scott's opinion was not consistent with the results of objective physical testing and that his opinion may have addressed mental deficits that are not within Dr. Scott's area of expertise. (Tr. 23).

The ALJ declined to give Dr. Ebrahimi's opinion controlling weight.  Tr. (Tr. 23).  The ALJ determined that Dr. Ebrahimi's finding that Mr. Scholtes was unable to function independently outside the home and maintain concentration, persistence, or pace for competitive

19

employment was inconsistent with findings of stable depression with no overt mania. (Tr. 23). The ALJ noted that Mr. Scholtes' mental health has been stable on medication with no changes in dosage over time.  The ALJ found that Dr. Ebrahimi's opinion in Exhibit 11F was inconsistent with or not supported by objective findings.  (Tr. 23).

The ALJ gave consideration to the opinions of Dr. Alsdurf, the non-examining state medical consultant. (Tr. 23).   The ALJ noted that new and significant evidence has entered the record since Dr. Alsdurf's review which supports the above RFC over that of Dr. Alsdurf. (Tr. 23).

The ALJ determined that Mr. Scholtes' overall functioning was inconsistent with disability.  (Tr. 23). The ALJ noted that Mr. Scholtes maintains a long-term relationship, performs household tasks, lives alone, manages personal cares, and drives a car.  (Tr. 23).   The ALJ recognized that the third party statements support Mr. Scholtes' claim of functional limitation, none of them clearly established that he was precluded from work. (Tr. 23).

Finally the ALJ determined that Mr. Scholtes' past tenuous connection with the work force necessitated a cautious approach to a determination of disability.  (Tr. 24).

At the fourth step in the evaluation process, the ALJ determined that Mr. Scholtes does not have a residual functional capacity (RFC) that permits him to perform any of his past relevant work. (Tr. 18).

At the fifth step of the evaluation process, the ALJ determined that considering Mr. Scholtes' age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Mr. Scholtes can perform.  (Tr. 24).  This determination was based upon the testimony of the VE, who testified that Mr. Scholtes would be able to

perform the work of occupations such as spotter/table monitor, bonder of semi-conductors, touch-up, and lens inserter. (Tr. 25).

Based on the above evaluation, the ALJ concluded that Mr. Scholtes did not meet the relevant statutory criteria for a finding of "disability" since June 28, 2004 (20 C.F.R. 416.920(g)).

### III.  STANDARD OF REVIEW

"We review *de novo* a district court decision upholding the denial of social security benefits." Bowman v. Barnhart, 310 F.3d 1080, 1083 (8th Cir.2002).  "We will affirm the ALJ's findings if they are supported by substantial evidence on the record as a whole." Id. (internal quotation omitted). "However, the review we undertake is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision[;] we also take into account whatever in the record fairly detracts from that decision." Id. (internal quotation omitted). In addition, when, as here, " 'the Appeals Council has considered new and material evidence and declined review, we must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence.' " Gartman v. Apfel, 220 F.3d 918, 922 (8th Cir.2000) (quoting Kitts v. Apfel, 204 F.3d 785, 786 (8th Cir.2000)).

### IV.  CONCLUSIONS OF LAW

**A.  The ALJ did not err in rejecting the testimony of Dr. Felling, that the Plaintiff met listing 12.04(c) or equaled listing 12.04(b) from July 2004 to the present.**

Mr. Scholtes argues that the ALJ erred in making his finding that Mr. Scholtes did not meet listing 12.04(c) or equaled listing 12.04(b) from July 2004 to the present.   The plaintiff first argues that the ALJ erred in not giving controlling weight to Dr. Felling's statement that Mr.

Scholtes' condition did meet or equal any listing.  The ALJ is not required to grant controlling

weight to medical opinions that are not supported by objective medical findings or that are

inconsistent with substantial evidence in the record. 20 C.F.R. §416.927(d)(3),(4); Social

Security Ruling 96-2p.  Dr. Felling's conclusion was qualified and his testimony contained

contradictory conclusions.  Dr. Felling qualified his statement by stating that he was basing it on

Dr. Ebrahimi's conclusions.  Dr. Felling noted that there were several inconsistencies in Dr.

Ebrihimi's notes.  The ALJ questioned Dr. Felling regarding the GAF scores, and Dr. Felling

was clear in his assessment that a GAF score above 50 was inconsistent with a serious

impairment.  The ALJ properly used his judgment to determine which of Dr. Felling's statements

to follow, that regarding the GAF score or that referencing Dr. Ebrihimi's conclusory statements.

The Plaintiff's arguments also suffer for legal sufficiency.  Plaintiff claims that his impairments

met Part B of listing 12.04. There is a requirement of a medically documented persistence of the

enumerated factors.  20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.04C.  For Part B

requirements of Listing 12.04 the Plaintiff  did not show that he meet two of the listed criteria.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.04B.

**B.  The ALJ did not err in not giving controlling weight to the opinions of Dr. Ebrahimi and Dr. Scott.**

The Plaintiff argues that the ALJ failed to fully consider and evaluate important medical

opinions of the treating physicians, which he contends should have been accorded controlling

weight. 20 C.F.R. 404.1527(d)(2); Woolf v. Shalala, 3 F.3d 1210 (8th Cir. 1993).  The ALJ can

reject statements by a physician that a claimant can not be gainfully employed because these are

not medical opinions. 20 C.F.R. §404.1572(e)(1); Cruiz v. Charter, 85 F.3d 1320, 1325 (8th Cir.

1996).   The ALJ is also not required to grant controlling weight to medical opinions that are not supported by objective medical findings or that are inconsistent with substantial record evidence. 20 C.F.R. §416.927(d)(3),(4); Social Security Ruling 96-2p.   If the treating physician's opinion is not accorded controlling weight, the weight given must be determined by an examination of five factors under 20 C.F.R. 404.1527(d).   These factors include the extent to which the opinion is supported by medical finding, the consistency of the opinion with the record as a whole, and specialization of the physician.

### 1. The ALJ properly determined the weight given to the opinions of Dr. Scott.

Here the ALJ properly determined the weight given to the opinions of Dr. Scott.  Dr. Scott's opinion that the Plaintiff was clearly incapable of competitive work was properly rejected.  Dr. Scott's conclusion was not adequately supported in the record.  The Plaintiff has had his condition treated conservatively, has continued smoking against multiple physicians' admonitions, and failed to continue his physical therapy despite his apparent progress.  The examinations of other physicians also contradicted Dr. Scott's conclusions.  Dr. Warford determined that Mr. Scholtes had clear lungs and no loss of sensation in his extremities.   Dr. Warford's notes also suggest that Mr. Scholtes may have been attempting to make his symptoms appear worse during his physical examination.

Dr. Scott's conclusions on the Request for Medical Opinions are not supported in the provided record. (Tr. 245).   There is no evidence that Dr. Scott has seen Mr. Scholtes since 2004 and, therefore, no basis for this revised opinion written in 2006.

The Plaintiff argues that when the treating physician's opinions are not refuted, the ALJ should not substitute his own opinion as to the Plaintiff's limitations. Miller v. Callahan, 971 F.

23

Supp. 393 (S.D. Iowa 1997).  Here, that is not an issue because the opinions are self-contradictory.  The ALJ did not substitute his own opinion, but used his judgment properly to disentangle the contradictory opinions of the physicians.

**2.  The ALJ properly determined the weight given to the opinions of Dr. Ebrahimi.**

Similarly, the ALJ properly determined the weight to be given to the opinions of Dr. Ebrahimi.  Dr. Ebrahimi's conclusions were not supported by objective medical findings.  Dr. Ebrahimi never explained how the conditions limited the patient's ability to work.   Dr. Ebrahimi's conclusions were internally inconsistent.  He found that the Plaintiff would be markedly impaired in concentration, persistence, or pace yet he also assessed the Plaintiff with GAF scores consistent with moderate limitations.  Dr. Felling testified that Dr. Ebrahimi's records lacked documentation for a diagnosis for attention deficit disorder, and that there were other GAF scores in the record that indicated a mild impairment.

The Plaintiff argues that the ALJ should have contacted additional medical sources for additional evidence or clarifications based on 20 C.F.R. 1512(e).  O'Donnel v. Bernhart, 318 F.3d 811, 818 (8th Cir. 2003) and Bowman v. Barhart, 310 F.3d 1080, 1085 (8th Cir. 2002).   The relevant statute states that "[w]hen the evidence we receive from your treating physician or psychologist or other medical source is *inadequate for us to determine* whether you are disabled, we will need additional information to reach a determination or a decision." 20 C.F.R. § 404.1512(e) (emphasis added).  Here, the ALJ properly determined that the evidence was adequate for this determination, despite some internal inconsistencies.  The ALJ properly made that determination based on substantial evidence in the entire record.

24

### C.  The ALJ did not err in finding that Mr. Scholtes could perform sedentary work on a full-time basis.

The Plaintiff contends that the ALJ erred in determining the RFC.  Specifically the plaintiff argues that the ALJ created the RFC findings "out of whole cloth." (Pl.'s Br. 17 ¶ 1). This is not the case.  Dr. Scott reported on that form that in an eight hour day, five-day per week basis, Mr. Scholtes is capable of sedentary work, lifting up to 10 lbs, occasionally lifting and carrying small items, standing/walking no more than two hours in eight-hour day. (Tr.231-232). Dr. Scott also reported that in an eight-hour day the patent can sit for about 6 hours and stand/walk for about 4 hours. (Tr. 235).  Dr. Scott was then confronted with a question regarding whether part time work was possible. When answering this question, Dr. Scott indicated that Mr. Scholtes was capable of part-time work in a competitive setting 4 hours a day five days a week. (Tr. 232).  It is understandable that Dr. Scott did not indicate in this question that Mr. Scholtes could work 8 hours a day.  No reasonable person would answer that someone is capable of part time work 8 hours a day 5 days a week because that would be considered full time work, and the question was specifically addressing part time work. While this form might benefit from some clarification, in this instance, the ALJ properly used his judgment based on the record as a whole, including the statements of Drs. Warford and Alsdurf, to determine the RFC despite these somewhat inconsistent statements by Dr. Scott.

### V.  RECOMMENDATION

Based on the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

> 1.  Plaintiff's Motion for Summary Judgment be **DENIED** [#5]; and

2.   Defendant's Motion for Summary Judgment be **GRANTED** [#10]**.**

DATED: April 25, 2008                    s/ *Franklin L. Noel*
                                         FRANKLIN L. NOEL
                                         United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **May 14, 2008**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.